## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Civil Action No.  17-10621 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CLASS ACTION** |
| TOKAI PHARMACEUTICALS, INC., JODIE P. MORRISON, SETH L. HARRISON, STEPHEN BUCKLEY, JR., CHERYL L. COHEN, DAVID A. KESSLER, and JOSEPH A. YANCHIK III, | ) ) ) ) ) | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of Tokai Pharmaceuticals, Inc. ("Tokai" or the "Company") against Tokai and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Tokai will purchase all of the ordinary and preferred shares of Otic Pharma, Ltd. ("Otic") in exchange for shares of Tokai common stock (the

"Proposed Transaction").  As a result of the Proposed Transaction, Otic will become a wholly owned subsidiary of Tokai and will operate under the name Otic Pharma, Inc.  In effect, the Proposed Transaction is allowing Tokai to sell its NASDAQ-listed shell to Otic.

2.      On December 22, 2017, Tokai announced that it had entered into a Share Purchase Agreement under which the stockholders of Otic will become the majority owners of Tokai. Under the terms of the Share Purchase Agreement, as amended and restated on March 2, 2017 (the "Share Purchase Agreement"), Tokai agreed to issue up to an aggregate of 36,911,631 shares of its common stock to Tokai, Otic and Otic's stockholders and to the holders of warrants and options of Otic upon the exercise of such options and warrants.  The number of shares to be issued to Otic stockholders in total is based on an exchange ratio of 4.255 shares of Tokai common stock for each Otic ordinary and preferred share (the "Exchange Ratio").  The relative percentage ownership of the combined company was derived using a stipulated value of Otic of approximately $50.0 million and of Tokai of approximately $33.0 million.  Following the closing of the Proposed Transaction, Otic's stockholders are expected to hold approximately 60% of the outstanding shares of Tokai common stock (62% if all of Otic's outstanding options and warrants are exercised prior to closing), with Tokai's stockholders owning approximately 40% (38% if all of Otic's outstanding options and warrants are exercised prior to closing).

3.      Additionally, on January 31, 2017, Tokai entered into a stock purchase agreement (the "Tokai Stock Purchase Agreement") with certain purchasers, who are either existing stockholders or employees of Otic, who have agreed to purchase 3,603,601 shares of Tokai common stock for $1.11 per share (the "Equity Financing").  After giving further effect to the issuance of shares in the Equity Financing, Otic's stockholders are expected to hold approximately 63% of the outstanding shares of Tokai common stock (64% if all of Otic's

outstanding options and shares are exercised prior to closing), with Tokai's stockholders owning approximately 37% (36% if all of Otic's outstanding options and warrants are exercised prior to closing).

4.     On April 7, 2017, Tokai filed a Definitive Proxy Statement on Schedule 14A with the SEC (the "Proxy"), in connection with the Proposed Transaction.   The Proxy, which recommends that Tokai stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Tokai management's projections, including the projections utilized by the Company's financial advisor, Wedbush Securities Inc. ("Wedbush") in its financial analyses; (ii) the valuation analyses prepared by Wedbush in connection with the rendering of its fairness opinion; (iii) Wedbush's potential conflicts of interest; and (iv) material information concerning the background of the process leading up to the Proposed Transaction.   The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Tokai stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

5.     In short, the Proposed Transaction is designed to unlawfully divest Tokai's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.   Tokai is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Tokai.

10.     Defendant Tokai is a Delaware corporation with its principal executive offices located at 255 State Street, 6th Floor, Boston, Massachusetts 02109.   The Company is a biopharmaceutical company focused on developing and commercializing therapies for prostate cancer and other hormonally driven diseases.  Tokai's common stock is traded on the NASDAQ under the ticker symbol "TKAI."

11.     Defendant Jodie P. Morrison ("Morrison") has been Chief Executive Officer ("CEO"), President and a director of the Company since March 2013.

12.     Defendant Seth L. Harrison ("Harrison"), one of Tokai's founders, has been Chairman of the Board since August 2005, a director since April 2005.

13.    Defendant Stephen Buckley, Jr. ("Buckley") has been a director of the Company since January 2015.

14.    Defendant Cheryl L. Cohen ("Cohen") has been a director of the Company since April 2015.

15.    Defendant David A. Kessler ("Kessler") has been a director of the Company since March 2009.

16.    Defendant Joseph A. Yanchik III ("Yanchik"), one of Tokai's founders, has been a director of the Company since August 2005.

17.    Defendants Morrison, Harrison, Buckley, Cohen, Kessler and Yanchik are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

18.    Otic is a private limited company organized under the laws of the State of Israel.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Tokai common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of

December 31, 2016, there were 22,641,651 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Tokai or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

22.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

23.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## **SUBSTANTIVE ALLEGATIONS**

### **Company Background**

26.     Tokai is a biopharmaceutical company that has focused substantially all of its

research and development efforts on the development of galeterone, an oral small molecule, including clinical trials of galeterone for the treatment of patients with metastatic castration-resistant prostate cancer ("mCRPC"). The Company also has a drug discovery program called ARDA (androgen receptor degradation agents), under which Tokai identifies novel compounds for patients with androgen receptor signaling diseases, including prostate cancer.

27.    In July 2016, Tokai announced its plan to discontinue ARMOR3-SV, its Phase 3 clinical trial comparing galeterone to Xtandi ® (enzalutamide) in treatment-naïve mCRPC patients whose prostate tumors express the AR-V7 splice variant, following the recommendation of the trial's independent data monitoring committee ("DMC"). Although the DMC did not cite any safety concerns with galeterone in the trial, Tokai determined that there was a substantial likelihood it will not pursue the development of galeterone in AR-V7 positive mCRPC patients in the future. Additionally, in August 2016, the Company determined to discontinue enrollment in its Phase 2 ARMOR2 expansion clinical trial of galeterone in mCRPC patients with acquired resistance to Xtandi.

**The Sale Process**

28.    Following the Company's discontinuation of its Phase 3 ARMOR3-SV trial and Phase 2 ARMOR2 clinical trial of galeterone, Tokai engaged Wedbush to advise the Company on available strategic alternatives.

29.    At a September 6, 2016 Board meeting, the Board established an independent transaction committee consisting of defendants Cohen and Buckley to oversee and guide the strategic transaction process (the "Transaction Committee"). On September 8, 2016, the Board appointed defendant Harrison as chairman of the Transaction Committee.

30.     Between September 1, 2016 and December 21, 2016, Tokai and Wedbush identified and screened approximately 145 companies, held meetings with 40 companies, received indications of interest from 24 companies, provided draft merger agreements to ten companies, received revised drafts of the merger agreement from four companies and ultimately entered into negotiations of the draft merger agreement with Otic and parties referred to in the Proxy as "Company A" and "Company B."

31.     On September 1, 2016, Wedbush contacted Otic based on an initial expression of interest by Greg Flesher ("Flesher"), Otic's CEO, the details of which the Proxy fails to disclose. Tokai and Otic entered into a confidentiality agreement on September 15, 2016.

32.     On September 6, 2016, Company A contacted Wedbush to express interest in exploring a possible strategic transaction with Tokai.  On September 12, 2016, Tokai and Company A executed a confidentiality agreement.  The Proxy fails to disclose whether the confidentiality agreement contains a standstill provision that is still in effect and prevents Company A from submitting a competing bid for the Company.

33.     At a September 21, 2016 meeting, the Board authorized management to enter into a consulting agreement with Apple Tree Life Sciences, Inc. ("Apple Tree"), an affiliate of Apple Tree Partners, under which Apple Tree would provide consulting, advisory and related services to Tokai from time to time.

34.     On September 23, 2016, Wedbush contacted Company B to explore the possibility of a potential strategic transaction with Tokai.  Following a positive indication of interest, the details of which the Proxy fails to disclose, Company B and Tokai executed a confidentiality agreement on September 26, 2016.  The Proxy fails to disclose whether the confidentiality

agreement contains a standstill provision that operates to preclude Company B from submitting a topping bid for the Company.

35.    From September 27, 2016 until December 21, 2016, Wedbush sent process letters to 32 companies, including Otic, Company A and Company B.

36.    At a September 27, 2016 Transaction Committee meeting, Wedbush noted it had received an unsolicited indication of interest for a business combination transaction with Tokai from one of the companies that had completed a management presentation.  The Proxy fails to disclose any details of this indication of interest.

37.    Between October 6, 2016 and October 13, 2016, Wedbush received non-binding indications of interest from 22 parties, including Otic, Company A and Company B.  Although the Proxy discloses certain details regarding Otic, Company A and Company B's indications of interest, the Proxy fails to include any details of the remaining 19 parties' indications of interest.

38.    Otic proposed a stock-for-stock transaction with current Otic stockholders receiving shares of Tokai common stock representing approximately 60% of the combined company and Tokai stockholders retaining a 40% ownership in the combined company, based on an ascribed value of $33 million for Tokai.

39.    Company A proposed a reverse merger transaction with current Company A stockholders receiving shares of Tokai common stock representing approximately 71% of the combined company and Tokai retaining ownership of approximately 29%, based on an ascribed value of $30 million for Tokai.

40.    Company B proposed a reverse merger transaction with current Company B stockholders receiving shares of Tokai common stock representing approximately 75% of the

combined company and Tokai retaining ownership of approximately 25%, based on an ascribed value of $30 million for Tokai.

41.     The Transaction Committee categorized the potential counterparties into high, medium and low priority categories. Otic and Company B were labeled high priority and Company A was labeled a medium priority.

42.     On October 22, 2016, a party referred to in the Proxy as Company C contacted defendant Morrison to express Company C's interest in a possible business combination with Tokai. The parties executed a confidentiality agreement on November 8, 2016. The Proxy fails to disclose whether the confidentiality agreement contains a standstill provision that operates to preclude Company C from submitting a competing bid for the Company.

43.     Between October 6, 2016 and throughout November 2016, Tokai management and the Transaction Committee held meetings with the eight high priority companies, including Otic, Company B and Company C. Otic and Company B also conducted due diligence.

44.     On November 14, 2016, Otic delivered a revised draft merger agreement to Tokai which indicated Otic's preference that the transaction be structured as a share purchase pursuant to which Tokai would acquire Otic's outstanding shares of capital stock directly from Otic stockholders rather than through a merger transaction, in exchange for a number of Tokai common shares to be issued to Otic stockholders.

45.     On November 17, 2016, Wedbush sent a process letter to Company C. Company C submitted an indication of interest on November 28, 2016, which proposed a reverse merger transaction with current Company C stockholders receiving shares of Tokai common stock representing approximately 78.3% of the combined company and Tokai retaining ownership of approximately 21.7%, based on an ascribed value of $25 million for Tokai.

46.     At a December 6, 2016 meeting, the Transaction Committee directed Tokai management and Wedbush to prioritize execution of a transaction with Otic while continuing to conduct diligence of Company A and Company C, and to advise Company B that it needed to improve its valuation terms to remain in the process.

47.     That same day, Company B delivered what it deemed a final revised draft merger agreement proposing that Company B stockholders would receive 10.3447 shares of Tokai common stock for each Company B common share they held.  Company B indicated it would not pursue the transaction after December 9, 2016.

48.     Company A also submitted a revised indication of interest providing for a reverse merger transaction with current Company A stockholders receiving shares of Tokai common stock representing approximately 62.5% of the combined company and Tokai retaining ownership of approximately 37.5% of Tokai and retaining defendant Morrison as President and CEO of the combined company.

49.     On December 9, 2016, Company C submitted a revised indication of interest, increasing Tokai's pre-combination stockholders' ownership following completion of a transaction to 24.05%, based on an ascribed value of $28.5 million for Tokai.  Company C submitted a further revised indication of interest on December 20, 2016, increasing Tokai's pre-combination stockholders' ownership to 26.72% following the close of a transaction.

50.     At a December 14, 2016 Board meeting, the Board discussed the uncertainties related to a transaction with Companies A and C, and determined that Company B would no longer be part of the strategic transaction process.

51.     On December 21, 2016, Tokai reviewed the final draft of the share purchase agreement to be entered into with Otic, and Wedbush delivered its fairness opinion to the Board.

Following discussion, the Board approved the Share Purchase Agreement and the Tokai Stock Purchase Agreement.

52.    Following the meeting, Tokai, Otic, and the Otic stockholders executed the Share Purchase Agreement and the related agreements.

**The Proposed Transaction**

53.    On December 22, 2016, following execution of the Share Purchase Agreement, Tokai and Otic issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> BOSTON, Mass., IRVINE, Calif., & REHOVOT, Israel--Dec. 22, 2016-- Tokai Pharmaceuticals Inc. (NASDAQ:TKAI) and Otic Pharma Ltd., a privately-held, clinical-stage pharmaceutical company focusing on the development and commercialization of products for disorders of the ear, nose, and throat (ENT), today announced that the two companies, together with the shareholders of Otic Pharma, have entered into a definitive share purchase agreement under which the shareholders of Otic Pharma will become the majority owners of Tokai.
>
> The transaction will result in a NASDAQ-listed company focused on the development and commercialization of products for ENT disorders, including Otic Pharma's lead candidate which is a nasally-administered, combination drug product (OP-02) intended to address the underlying cause of otitis media and Eustachian tube dysfunction (OM/ETD), a condition that affects more than 700 million people around the world every year. The company will operate under the name OticPharma, Inc., and will be led by Gregory J. Flesher, current Chief Executive Office of Otic Pharma Ltd. Current President and Chief Executive Officer of Tokai,Jodie Morrison, will remain as a member of the board of directors.
>
> * * *
>
> "Our lead program in otitis media, OP-02, has significant potential," said Gregory J. Flesher, Chief Executive Officer of Otic Pharma. "OP-02 is an investigational drug product designed to break the cycle of recurrent and chronic otitis media which affect millions of people around the world. We expect to have phase 1 clinical pharmacodynamic data in the first half of 2017 and, with this transaction, to have the capital needed to be able to move directly into phase 2 development to explore the product's ability to prevent otitis media in children."

**Share Purchase Agreement Details**

Under the terms of the agreement, the shareholders of Otic Pharma will receive a total of 32,172,209 shares of newly issued Tokai common stock, while outstanding Otic Pharma options and convertible securities will be assumed by Tokai. Upon the exchange, it is expected that existing Tokai stockholders will own approximately 40% of the combined company, with existing Otic Pharma shareholders owning approximately 60%. The transaction has been unanimously approved by the boards of directors of both companies and shareholders of Otic Pharma. Tokai's largest stockholder, Apple Tree Partners, who holds approximately 35% of Tokai's common stock has entered into an agreement in support of the proposed transaction. The transaction is expected to close during the first quarter of 2017, subject to customary closing conditions, including approval by shareholders of Tokai.

### Insiders' Interests in the Proposed Transaction

54.    Otic and Tokai insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Tokai.

55.    Notably, according to the Proxy, defendants Cohen, McBride and Morrison have secured positions on the board of directors of the combined company.

56.     In addition, if they are terminated in connection with the Proposed Transaction, Tokai's named executive officers stand to receive substantial cash severance payments, as summarized in the following table:

| Name | Cash (1) | Equity Awards (2) | Perquisites/ Benefits | Total |
|------|------|------|------|------|
| Jodie Morrison | $  1,050,000 | — | $     44,284 [3] | $  1,094,284 |
| John McBride | $   550,530 | — | — | $   550,530 |

### The Proxy Contains Numerous Material Misstatements or Omissions

57.    The defendants filed the materially incomplete and misleading Proxy with the SEC and disseminated it to Tokai's stockholders.  The Proxy misrepresents or omits material information

that is necessary for the Company's stockholders to make an informed voting decision with respect to the Proposed Transaction.

58.    Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning (i) Tokai and Otic's financial projections; (ii) the sale process that resulted in the Proposed Transaction; (iii) Wedbush's potential conflicts of interest; and (iv) the valuation analyses performed by Wedbush in support of its fairness opinion.  Accordingly, Tokai stockholders are being asked to vote in favor of the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Tokai and Otic Management's Financial Projections***

59.    The Proxy is also materially deficient because it fails to disclose material information relating to Tokai and Otic's intrinsic value and prospects going forward.

60.    The Proxy fails to disclose any information regarding Tokai's intrinsic value.  For example, the Proxy fails to disclose Tokai's projected use of cash and cash burn forecast.  This information is material to Tokai stockholders as it is unclear approximately how much net cash Tokai is anticipated to retain at closing.  The Proxy states on page 182, "Tokai does not anticipate declaring and paying any cash dividends prior to the closing of the Otic Transaction and anticipates that its net cash at the closing will be approximately **$25.0 million**" (emphasis added).  Yet, on page 86, the Proxy discusses "the approximately **$20.0 million** net cash that was expected to be retained by Tokai upon completion of the Otic Transaction" (emphasis added).  In addition, the Proxy fails to disclose any projections for Tokai, including with respect to its galeterone and ARDA programs.  This information is critical for Tokai stockholders to assess the intrinsic value of Tokai and the fairness of the Exchange Ratio in order to make an informed voting decision with respect to the Proposed Transaction.

61.     Although Tokai stockholders will receive Otic shares in exchange for their Tokai shares in the Proposed Transaction, the Proxy fails to disclose any financial projections for Otic. Notably, according to the Proxy, Otic management provided Wedbush with "certain operating expense forecasts for the five years ended December 31, 2021" in connection with its financial analyses.  However, the Proxy fails to disclose any information regarding the Otic operating expense forecasts.  In addition, the Proxy fails to provide Tokai's stockholders with any information concerning Otic's lead product candidates, OP-01 and OP-02, including the information Otic management provided Tokai concerning Otic's development plans for its lead product candidates.  Without this critical information, Tokai stockholders have no empirical basis upon which to value Otic, leaving Tokai stockholders in the dark as to whether the Board agreed to an adequate exchange ratio based on the intrinsic values of Otic and Tokai.

62.     Omission of this material information makes the following Proxy information false and/or misleading:

(a)     From page D-2 of the Proxy:

Further, as you are aware, Otic's management did not provide us with, and we did not otherwise have access to, financial forecasts regarding Otic's business, other than certain operating expense forecasts for the five years ended December 31, 2021, and, accordingly we did not perform either a discounted cash flow analysis or any multiples-based analyses with respect to Otic. With respect to the operating expense forecasts of Otic, upon the advice of Tokai and Otic, we have assumed that such projections have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Otic as to the future operating expenses of Otic and that Otic will perform substantially in accordance with such projections.

(b)     From page 82 of the Proxy:

On November 29, 2016, representatives of Tokai and Otic held an in-person meeting at the offices of Apple Tree Partners in New York. The attendees included Ms. Morrison, Dr. Harrison, Mr. Flesher and Keith Katkin, the chairman of the board of directors of Otic. At the meeting, the parties discussed the terms of Otic's offer, the potential composition of the board of directors following the closing of a

transaction, requirements for a concurrent financing and potential investors with which Otic had already held meetings and which might have interest in participating in a concurrent financing. The representatives of Otic also provided the Tokai representatives with additional information regarding Otic's development plans for its lead product candidates, OP-01 and OP-02. After a discussion, the Otic representatives proposed that the companies enter into a period of exclusive negotiation, which was rejected by Tokai upon authorization of the Transaction Committee.

### Material Omissions Concerning the Sale Process

63.    The Proxy also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction.

64.    The Proxy fails to indicate whether the confidentiality agreements entered into between the Company and a number of parties contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these industry participants from making a topping bid for the Company.  Specifically, the Proxy fails to disclose details of the confidentiality agreements Tokai entered into with Company A on September 12, 2016, Company B on September 26, 2016, Company C on November 8, 2016 and the undisclosed "number of counterparties that had been contacted and that had signed confidentiality agreements" that Wedbush reviewed with the Board at its September 21, 2016 meeting.  Such information is material to Tokai stockholders as a reasonable Tokai stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential transaction with the Company are now foreclosed from submitting superior proposals.

65.    In addition, the Proxy fails to disclose the details of the indications of interest Tokai received from 24 parties between September 1, 2016 and December 21, 2016, including (i) Otic CEO Greg Flesher's initial expression of interest in or around early September 2016; (ii) Company B's positive indication of interest on or around September 23, 2016; (iii) the indication of interest that one of the companies that had completed a management presentation submitted to the

Transaction Committee on or around September 27, 2016; and (iv) the indications of interest Wedbush received for Tokai from 19 parties between October 6, 2016 and October 13, 2016 (not including Otic and Companies A and B).

66.    Further, the Proxy states that "substantially all of the parties with which Tokai had discussions only expressed an interest in pursuing a reverse merger transaction", yet fails to disclose the nature of the remaining indications of interest which did not pertain solely to a reverse merger transaction.

67.    Without this information, Tokai's public stockholders are unable to assess the credibility of the process the Board employed to sell the Company and the weight to give its decision-making process in deciding whether to vote for the Proposed Transaction.

68.    Omission of this material information makes the following Proxy information false and/or misleading:

(a)    From pages 76-79 of the Proxy:

On September 1, 2016, representatives of Wedbush began contacting companies to gauge interest in a strategic transaction with Tokai. One of the companies contacted on September 1, 2016 was Otic. Based on an initial expression of interest by Greg Flesher, the chief executive officer of Otic, Wedbush sent Otic a confidentiality agreement on September 6, 2016. Tokai and Otic executed the confidentiality agreement on September 15, 2016.

* * *

On September 6, 2016, a member of the board of directors of Company A contacted Wedbush and expressed interest in exploring a possible strategic transaction with Tokai. Company A is a clinical stage company focused on respiratory disorders. Later that day, representatives of Wedbush spoke with the chief executive officer of Company A and, following that call, sent Company A a confidentiality agreement. The parties executed the confidentiality agreement on September 12, 2016. On September 12, 2016, representatives of Wedbush spoke further with the chief executive officer of Company A regarding the timing of a possible transaction, issues related to Tokai's ongoing shareholder litigation and Tokai's projected cash balance at the anticipated time of the closing of a transaction.

* * *

On September 21, 2016, the Board held a telephonic meeting with a member of Tokai management (John McBride) and representatives of Wedbush and WilmerHale present. At the meeting, the representatives of Wedbush reviewed the process that had been adopted by the Transaction Committee and updated the Board on the number of counterparties that had been contacted and that had signed confidentiality agreements and, after a discussion, left the meeting.

* * *

On September 23, 2016, representatives of Wedbush contacted Company B, a clinical stage company focused on dermatologic disorders, to explore the possibility of a potential strategic transaction between Tokai and Company B. In response to a positive indication of interest, representatives of Wedbush sent Company B a confidentiality agreement and requested to schedule an initial meeting between the management teams of Tokai and Company B. The parties executed the confidentiality agreement on September 26, 2016.

* * *

The representatives of Wedbush noted that Wedbush had received an unsolicited indication of interest for a business combination transaction involving Tokai from one of the companies that had completed a management presentation, with Tokai management. After a discussion, and in light of the terms offered by the bidder and the preliminary view of the business and prospects of the bidder, the Transaction Committee agreed that it would include the bidder in the strategic transaction process and consider the bidder's indication of interest with the other indications of interest received by Tokai and not disrupt the process that had been established. The Transaction Committee also agreed that as additional companies completed management presentations it would consider authorizing the delivery of process letters by email.

* * *

Between October 6, 2016 and October 13, 2016, representatives of Wedbush received written non-binding indications of interest from 22 parties, including Otic, Company A and Company B, each detailing proposed terms for a strategic transaction between the parties and Tokai.

* * *

On October 22, 2016, a representative of Brock Capital, the financial advisor for Company C, emailed Ms. Morrison to express Company C's interest in exploring a possible business combination between Company C and Tokai. Company C is a clinical stage company focused on developing cancer therapeutics. On October 31,

2016, Wedbush sent Company C a copy of the confidentiality agreement. The parties executed the confidentiality agreement on November 8, 2016.

***Material Omissions Concerning Wedbush's Potential Conflicts of Interest***

69.    In addition, the Proxy fails to disclose material information concerning the potential conflicts of interest faced by Wedbush in acting as the Company's financial advisor.

70.    The Proxy discloses the fee payable to Wedbush by Tokai as a result of the Proposed Transaction, and the compensation paid to Wedbush by Tokai over the past two years as well as the nature of the services provided.

71.    However, the Proxy fails to disclose whether Wedbush has provided any services to Apple Tree, the Company's largest stockholder and a consultant to the Board in connection with the sale process, in the past two years, and if so, the nature of those services and the amount of compensation it earned for those services.

72.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

73.    The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)    From pages 99-100 of the Proxy:

This summary is not a complete description of Wedbush's opinion or the underlying analyses and factors considered in connection with Wedbush's opinion. The preparation of a fairness opinion is a complex process involving the application of subjective business and financial judgment in determining the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and, therefore, is not readily susceptible to partial analysis or summary description. Wedbush believes that its analyses described above must be considered as a whole and that considering any portion of such analyses and of the factors considered without considering all analyses and factors could create a misleading view of the process underlying its opinion. Selecting portions of the analyses or summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying

the Wedbush opinion. In arriving at its fairness determination, Wedbush considered the results of all of its analyses and did not attribute any particular weight to any factor or analysis. Rather, it made its fairness determination on the basis of its experience and professional judgment after considering the results of all of its analyses. No company or transaction in the analyses described above is identical to Tokai, Otic or the transaction.

In conducting its analyses and arriving at its opinion, Wedbush utilized a variety of valuation methods. The analyses were prepared solely for the purpose of enabling Wedbush to provide its opinion to the Tokai board of directors as to the fairness of the exchange ratio in connection with the transaction, from a financial point of view, to the stockholders of Tokai as of the date of the opinion and do not purport to be an appraisal or necessarily reflect the prices at which businesses or securities actually may be sold, which are inherently subject to uncertainty.

The terms of the transaction were determined through arm's-length negotiations between Tokai and Otic and were approved by the Tokai board of directors. Although Wedbush provided advice to the Tokai board of directors during the course of these negotiations, the decision to enter into the Share Purchase Agreement was solely that of the Tokai board of directors. Wedbush did not recommend any specific consideration to Tokai or the Tokai board of directors, or that any specific amount or type of consideration constituted the only appropriate consideration for the transaction. As described above, the opinion of Wedbush and its presentation to the Tokai board of directors were among a number of factors taken into consideration by the Tokai board of directors in making its determination to approve the Share Purchase Agreement, the transaction and the other transactions contemplated by the Share Purchase Agreement.

### Material Omissions Concerning Wedbush's Financial Analyses

74.   The Proxy also describes Wedbush's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Wedbush's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Tokai's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Wedbush's fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Tokai's stockholders.

75. For example, with respect to Wedbush's *Public Company Market Valuation Analysis* with respect to Otic, the Proxy fails to disclose the individual multiples for each of the selected public companies analyzed by Wedbush, as well as any benchmarking analyses Wedbush performed for Otic in relation to the selected public companies.

76. Similarly, with respect to Wedbush's *Precedent Merger and Acquisition Transaction Analysis* with respect to Otic, the Proxy fails to disclose the individual multiples for each of the selected transactions analyzed by Wedbush, as well as any benchmarking analyses Wedbush performed for Otic in relation to the target companies.

77. Without this omitted information, Tokai stockholders have no way of determining whether the multiples applied by Wedbush were appropriate when compared to the multiples observed for the selected companies and transactions, and thus, have no way of determining whether the implied ownership percentages accurately reflect the value of their shares.

78. Omission of this material information makes the following Proxy information false and/or misleading:

(b)    From pages 95-98 of the Proxy:

***Public Company Market Valuation Analysis—Otic***

Wedbush reviewed publicly available information relating to the following publicly-traded companies with an aggregate market capitalization between $33 million and $1 billion in the biopharmaceutical industry with Phase 1 product candidates (and no product candidates beyond Phase 1 or Phase 1/2) that as of December 20, 2016 did not have human efficacy data (the " Phase 1 Companies "), which criteria were applied to select for companies similar to Otic:

- Regenxbio Inc.;

- Protagonist Therapeutics, Inc.;

- Voyager Therapeutics;

- Ra Pharmaceuticals, Inc.;

- Proteostasis Therapeutics, Inc.;

- Madrigal Pharmaceuticals, Inc.;

- Applied Genetic Technologies Corporation;

- KalVista Pharmaceuticals, Inc.; and

- Dimension Therapeutics, Inc.

Wedbush noted that, although such companies had certain financial and operating characteristics that could be considered similar to those of Otic, none of the companies had the same management, make-up, technology, size or mix of business as Otic and, accordingly, there were inherent limitations on the applicability of such companies to the valuation analysis of Otic. Wedbush focused on companies with no product candidates beyond Phase 1 or Phase 1/2 and have no human efficacy data because although Otic's product candidate OP-01 had been developed as a first generation foam platform to validate the technology, it is no longer being developed in its original form. The first generation product candidate has now been modified and has been pursued by Otic as a second generation compound that is currently in preclinical development. Wedbush also noted that OP-02 has been Otic's lead product candidate and is in the most advanced development phase of any compound in Otic's current pipeline. In addition, OP-02 is the only product candidate Otic has been recently pursuing for which an IND has been filed.

Wedbush calculated the aggregate market capitalization of each of the selected companies based upon the closing price of the common stock of each selected company on December 20, 2016 and the fully-diluted number of shares outstanding, using the treasury stock method. The results of this analysis are summarized as follows:

|  | Market Capitalization at December 20, 2016 ($ in millions) |
| --- | --- |
|  | Phase 1 Companies |
| Mean | $ 287.2 |
| Median | $ 302.0 |

Wedbush calculated the implied ownership of holders of Tokai common stock in the combined company based upon the approximate $33.0 million value attributed to the Tokai common stock and the approximate $50.0 million value attributed to the Otic common stock pursuant to the exchange ratio in connection with the transaction, and the mean and median values described above.

The results of this analysis are summarized as follows:

**Public Company Market Valuation Analysis**

| | Equity Value ($ in millions) | Ownership |
|---|---|---|
| Otic Equity Value per Share Purchase Agreement | $ 50.0 | 60% |
| Tokai Equity Value per Share Purchase Agreement | $ 33.0 | 40% |
| **Aggregate Value per Share Purchase Agreement** | **$ 83.0** | **100%** |

| | Mean | | Median | |
|---|---|---|---|---|
| | Equity Value ($ in millions) | Ownership | Equity Value ($ in millions) | Ownership |
| Otic Equity Value per Public Company Market Valuation Analysis | $ 287.2 | 90% | $ 302.0 | 90% |
| Tokai Equity Value per Share Purchase Agreement | $ 33.0 | 10% | $ 33.0 | 10% |
| **Implied Aggregate Value** | **$ 320.2** | **100%** | **$ 335.0** | **100%** |

Wedbush noted that the implied ownership percentage of holders of Tokai common stock based upon the approximate $33.0 million value attributed to the Tokai common stock and the approximate $50.0 million value attributed to the Otic common stock pursuant to the exchange ratio in connection with the transaction was higher than the implied ownership percentages derived based upon the mean and median equity values attributed to Otic described above.

### *Precedent Merger and Acquisition Transaction Analysis—Otic*

Wedbush reviewed publicly available information relating to the following acquisitions of private companies in the biopharmaceutical industry considered by Wedbush to be similar to Otic, which had Preclinical and Phase 1 product candidates (and no product candidates beyond Phase 1 or Phase 1/2) that did not have human efficacy data at the time of announcement of the transaction, with an aggregate valuation (based solely upon upfront payments and excluding contingent value rights or other post-closing payments) of between $33 million and $1.0 billion and announced between May 2014 and September 2016 (the " *Selected Transactions* "):

| Announcement Date | Target | Acquiror |
|---|---|---|
| September 6, 2016 | RetroSense Therapeutics | Allergan plc |
| August 1, 2016 | Bamboo Therapeutics | Pfizer |
| July 5, 2016 | Cormorant Pharmaceuticals | Bristol-Myers Squibb |
| December 23, 2015 | PhosImmune | Agenus |
| October 21, 2015 | Admune Therapeutics | Novartis AG |
| October 9, 2015 | Adheron Therapeutics | Roche Holding AG |
| July 28, 2015 | cCAM Biotherapeutics | Merck & Co. |
| May 1, 2014 | Fibrotech Therapeutics Pty | Shire plc |

Wedbush noted that although the companies that were acquired in the Selected Transactions had certain financial and operating characteristics that could be considered similar to those of Otic, none of such companies had the same management, make-up, technology, size or mix of business as Otic and,

accordingly, there were inherent limitations on the applicability of such companies to the valuation analysis of Otic. Wedbush also noted that market conditions have varied over the precedent time periods.

Wedbush calculated the aggregate value of each of the target companies in the Selected Transactions (based solely upon upfront payments and excluding contingent value rights or other post-closing payments). The results of this analysis are summarized as follows:

|  | Valuation ($ in millions) |
|---|---|
| Mean | $ 89.1 |
| Median | $ 85.0 |

Wedbush calculated the implied ownership of holders of Tokai common stock in the combined company based upon the approximate $33.0 million value attributed to the Tokai common stock and the approximate $50.0 million value attributed to the Otic common stock pursuant to the exchange ratio in connection with the transaction, and the mean and median values described above.

The results of this analysis are summarized as follows:

| | Merger and Acquisition Transaction Analysis | |
|---|---|---|
| | Equity Value | Ownership |
| Otic Equity Value per Share Purchase Agreement | $ 50.0 | 60% |
| Tokai Equity Value per Share Purchase Agreement | $ 33.0 | 40% |
| **Aggregate Value per Share Purchase Agreement** | **$ 83.0** | **100%** |

| | Mean | | Median | |
|---|---|---|---|---|
| | Equity Value ($ in millions) | Ownership | Equity Value ($ in millions) | Ownership |
| Otic Equity Value per Merger and Acquisition Transaction Analysis | $ 89.1 | 73% | $ 85.0 | 72% |
| Tokai Equity Value per Share Purchase Agreement | $ 33.0 | 27% | $ 33.0 | 28% |
| **Implied Aggregate Value** | **$ 122.1** | **100%** | **$ 118.0** | **100%** |

Wedbush noted that the implied ownership percentage of holders of Tokai common stock based upon the approximate $33.0 million value attributed to the Tokai common stock and the approximate $50.0 million value attributed to the Otic common stock pursuant to the exchange ratio in connection with the transaction

was higher than the implied ownership percentages derived based upon the mean and median equity values attributed to Otic described above.

## CLAIMS FOR RELIEF

### COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

79.    Plaintiff repeats all previous allegations as if set forth in full.

80.    During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

81.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the defendants.  The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the financial analyses performed by the Company's financial advisor, and the actual intrinsic standalone value of the Company.  The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

82.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

83.    By reason of the foregoing, the defendants have violated Section 14(a) of the

Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

85.     Plaintiff repeats all previous allegations as if set forth in full.

86.     The Individual Defendants acted as controlling persons of Tokai within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Tokai and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

were, thus, directly involved in the making of this document.

89.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Tokai, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Tokai stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: April 11, 2017

*/s/ Mitchell J. Matorin*

Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, Massachusetts 02482
(781) 453-0100
mmatorin@matorinlaw.com

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*